**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**                                              **No. 2:09-cr-20235-JPM-cgc**

**STEVEN SHAW,**

        **Defendant.**

**REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTION TO SUPPRESS**

**I. Introduction**

Before the Court is Defendant Steven Shaw's ("Defendant" or "Shaw") Motion to Suppress filed pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure (D.E. #41). The motion was referred to United States Magistrate Judge Charmiane G. Claxton for Report and Recommendation (D.E. #42). An evidentiary hearing was held before the Magistrate Judge on February 19, 2010. For the reasons set forth herein, the Court RECOMMENDS that Defendant's Motion to Suppress be DENIED.

**II. Findings of Fact**

**A. Evidence of Constitutionality of Search**

On October 28, 2008, Officer Harold Cheirs ("Officer Cheirs") of the Shelby County Sheriff's Department was assigned to serve an arrest warrant on Phyllis Brown ("Brown") at the address of 3171 Hendricks. (Feb. 19, 2010 H'rg Tr. at 33, filed at D.E. #52.) Officer Cheirs and

his partner, Officer Robinson, used "Map Quest" to obtain directions to 3171 Hendricks, but upon arriving at the location, he noticed "two addresses that had 3170." (Id. at 34.) Specifically, one residence had 3170 "on the sidewalk" or "on the curb" and the other residence had 3170 "on the house." (Id.) Upon noticing the two houses marked as 3170, Officer Cheirs "decided to go to the house with the open door" that had "lots of cars in front." (Id.) Officer Cheirs did not further investigate on the outside of the two addresses to determine which residence was the correct address, and in particular he did not look into whether the residence he chose to approach was on the odd-numbered side of the street based upon the usual arrangement of even-numbered addresses on one side of a street and odd-numbered addresses on the other. (Id. at 49.) He explained that he generally attempts to "make contact" first and would investigate outside if he was not able to do so. (Id.)[1]

When Officer Cheirs approached the front door, he noticed that the "screen door" or "security door" was "blacked out." (Id. at 35.) Officer Cheirs paused to observe "what was going on" inside the residence and "could see . . . a couple people in the living room, people in the kitchen area and stuff on like scales on the table." (Id.) He continued to "look and listen" for "a couple seconds or minutes" to "see what's going on in the house." (Id.) After some moments of observation, Officer Robinson proceeded to the back of the house, and Officer Cheirs knocked on the door. (Id.) Upon knocking, a female closed the door on Officer Cheirs, who was dressed in his police uniform, and Officer Cheirs yelled to his partner to advise him of the situation. (Id. at 35, 50-51.)

---

[1] With respect to whether a recording of the entry exists, Officer Cheirs testified that a video and audio recording was "probably" made of the entry into the house from his car, but no request was made within thirty days of the incident to preserve the recording. (Id. at 64-65.) Thus, as far as Officer Cheirs is aware, the recording no longer exists. (Id. at 65.)

Officer Cheirs proceeded to knock on the same door again, and "seven to eight minutes" passed before anyone opened the door. (Id. at 35.) When a female occupant did open the door, Officer Cheirs announced, "we got a warrant for this address." (Id.) He also "radioed" to Officer Robinson to "come around front." (Id. at 52.) However, he did not advise the female occupant at that point of what address he sought in the arrest warrant. (Id. at 37.) Instead, Officer Cheirs asked "who all lives here" and "who's the owner?" (Id. at 35-36.)[2] The occupants did not "really say who was the owner" but asked who the officers were looking for and what address they were sought. (Id. at 36.) Officer Cheirs stated that they were looking for 3170 Hendricks instead of the actual address on the warrant of 3171 Hendricks. (Id. at 36.) Officer Cheirs stated that he intentionally asked about the incorrect address because people often lie "when you are looking for a particular address." (Id. at 37-38.) Thus, he stated that he used this technique to illicit "what was really the address here." (Id. at 38.) In response, a female responded that the address was 3171, and "then everybody else said 3171" and "confirmed it." (Id. at 36, 38, 59.)

Based upon the occupants' representations, Officer Cheirs "believed that it was the correct address at that time." (Id. at 38.) Officer Cheirs determined that no "further investigation" into the correct address was necessary because the occupants volunteered that this address was 3171. (Id. at 56.) When combined with what he perceived to be suspicious activity when he approached the residence, the circumstances made him "think we had the right address more so." (Id. at 57.) Thus, Officer Cheirs again informed the occupants that they had "a warrant for this address" and stated

---

[2] In response to Officer Cheirs's inquiries, Shaw and an unidentified female stated that they lived at the house. (Id. at 36). However, because Shaw had not been given Miranda warnings at this time, the Government has stipulated that "statements at the scene are not admissible." (Id. at 66.)

3

that he needed "everybody to come up front" and "have a seat on the couch." (Id. at 36, 38.)

After instructing the occupants to gather in the front of the house, Officer Cheirs and his partner inquired into whether any weapons were in the house and then "started searching for bodies." (Id. at 38.) Officer Cheirs said he initially believed that the female that closed the door on him was Brown because, "usually when people do something like that, . . . I'm thinking that, well, we got one fixing to run or something, fixing to hide." (Id. at 56-57.) However, with respect to whether he would have been able to recognize Brown, Officer Cheirs stated that he did not recall whether or not he had seen a photo of Brown, whether he "pulled her booking photo," whether any photo was attached to the arrest warrant, or whether he did any further search into obtaining a photo. (Id. at 56-58.)

Upon entering the residence, Officer Robinson "went toward the back bedroom area" in order to "make sure everybody is up front" and Officer Cheirs "stayed in the front room" with the individuals already gathered there. (Id. at 39, 59.) As Officer Robinson proceeded "back toward the bathroom, he noticed the string going up and down" from the attic and believed that "somebody was up in the attic." (Id.) Officer Robinson "pointed up" to the attic to alert Officer Cheirs of his concern. (Id.) Officer Cheirs adjusted his position from the front of the house, where he had been making sure "nobody can leave," to a better position to observe Officer Robinson's securing of the attic, "in case something goes wrong." (Id. at 40.) At this point, Officer Cheirs "was thinking the person [that they were] really looking for went in the attic." (Id.)

When Officer Robinson pulled "down the latch," he "didn't get a chance to go up there" because "a white substance and white powder and a plastic silhouette just fell from the ground." (Id.) Officer Cheirs stated that it was approximately "three or four bags" that "appeared to be

4

cocaine." (Id.) Following the substances falling from the attic, the officers put "all the males in handcuffs" and requested their immediate supervisor and other units from the fugitive office to proceed to the scene. (Id. at 40, 60.) Officer Cheirs testified that he still believed that he was at 3171 Hendricks at this time and no one had informed him otherwise. (Id. at 40-41.)

After placing approximately five people in handcuffs and waiting a "long period of time," which Officer Cheirs estimates was "a good 20 or 30," one of the females that Officer Cheirs believed to be Shaw's girlfriend asked him who they were seeking to serve with the arrest warrant. (Id. at 41, 61.) Officer Cheirs testified that this "was the first time they asked me who were we looking for." (Id. at 41.) Officer Cheirs stated that they were "looking for Phyllis Brown" and one of the occupants stated that she was "across the street." (Id.) Officer Cheirs "said okay" and "waited for narcotics to get there and let them take over the scene." (Id.)

Officer Jason Bartlett ("Officer Bartlett") of the Shelby County Sheriff's Office was assigned to the narcotics investigation, proceeded to the scene, and was shown the evidence that Officers Cheirs and Robinson had discovered. (Id. at 20, 68.) Officer Bartlett contacted Detective Page to relay the information, "at which time he started writing the search warrant." (Id. at 69.)[3] During this time, Officer Bartlett was "[p]retty much standing by" and "[j]ust waiting." (Id. at 72.) Shaw

---

[3] Defendant states that, during the search warrant application, a "[Memphis Light Gas & Water, or "MLGW,"] check of the residence found it to be 3170 Hendricks, and listed . . . Wayne Kelly . . . as the owner of the residence." (Def.'s Mot. to Suppress at 5.) Defendant states that the application for the state search warrant contained this information verbatim. (Id.) However, as the state search warrant has not been made part of the record and this information was not presented at the evidentiary hearing or otherwise made part of the record, the Court will not consider this evidence for purposes of the Motion to Suppress. Further, even if this evidence were in the record before the Court, it would not have impacted the Court's Report and Recommendation, as this information was obtained only subsequent to the search of the Hendricks residence.

and the other individuals were "sitting in the living room" throughout this period. (Id.)

Eventually, the narcotics officers applied for and obtained a search warrant for the residence. (Id. at 69.) Approximately three hours after Officers Cheirs and Robinson initially arrived on the scene, the narcotics officers executed the search warrant. (Id.) The execution took approximately thirty to forty-five minutes, which included photographing and securing the evidence. (Id. at 73.) After the search warrant was served, Shaw and "several other subjects" were transported to "1080 Madison" for questioning. (Id. at 69.)

At 1080 Madison, Shaw was advised of his Miranda rights and subsequently agreed to speak with Officer Bartlett. (Id. at 69-70.) Shaw "substantially confess[ed] to the drugs and the gun found in the place." (Id. at 70.) When asked at the conclusion of his interview whether he had been treated fairly, Shaw responded affirmatively. (Id.) When asked whether or not there had been any threats or promises made to him, Shaw stated, "no, there had been no threats." (Id.) While the narcotics officers conducted the investigation at that residence, Officer Cheirs and his partner did their "part to locate that individual which was across the street." (Id.)

## B. Evidence of Defendant's Standing

In addition to the testimony regarding the search of the Hendricks residence[4] on October 28, 2008, the parties presented evidence at the February 19, 2010 hearing as to whether Shaw has standing to contest the legality of the search. Pamela White ("White"), Shaw's mother, testified that she had lived at the Hendricks residence for "[a]bout three years" and that Shaw lived with her on

---

[4] The Court will refer to the home searched in this matter where Officers Cheirs and Robinson discovered narcotics evidence as the "Hendricks residence" to avoid confusion regarding the address. Although the home across the street on Hendricks was apparently later searched for Brown, the incidents at that residence have no relation to the matter against Shaw.

the date that he was arrested in this case. (Id. at 6-7.) When asked whether Shaw stayed at the Hendricks residence every day, White responded as follows: "Just about every day. Well, you could say every day. Some days he'll go to his girlfriend's house and spend the night, but he was living there." (Id. at 7.) When asked if Shaw had stayed at the Hendricks residence the night before this incident, White responded, "[p]robably a couple nights. He had been there all that day, particularly all that day and he left." (Id.)

On cross-examination, White denied failing to name Shaw as one of the residents of her home when she was questioned on the date of his the arrest and further stated that she does not recall ever neglecting to mention Shaw as a resident of the home. (Id. at 14-15.) Instead, White testified that she reported on the date of the arrest that her son "stayed there often with me in and out most of the time" and that he was there "off and on." (Id.) On redirect examination, White again stated that she does not "really remember, recall" whether the officers asked her whether Shaw lived at her residence. (Id. at 18.) However, she again affirmed that Shaw did stay there "majority most of the time," that he does live at her home, and that he stays with his girlfriend "[o]ff and on." (Id. at 18-19.)

Officer Jason Bartlett of the Shelby County Sheriff's Office testified that he was involved in the October 28, 2008 arrest of Shaw. (Id. at 20.) Officer Barlett testified that, when White was asked on that date if other individuals live at the Hendricks residence, she "stated that her daughter and the boyfriend are off and on sometimes as well at the residence." (Id. at 22.) Officer Bartlett testified that he asked White whether Shaw lived at the Hendricks residence and that she stated that he did not. (Id. at 22.) However, Officer Bartlett testified that White said at the scene that Shaw does "frequent by the house" and was "there off and on." (Id. at 22-23).

7

On cross-examination, Officer Bartlett testified that he did search for mail at the residence, as is "common practice" to identify the residents, but that he did not believe he located any mail with Shaw's name as the addressee or addressor. (Id. at 24.) Further, he stated that there was "male clothing" found at the residence, but that he could not identify the owner of the clothes. (Id. at 24-25). As to whether any identification of Shaw's was found at the Hendricks residence, Officer Bartlett stated that he "couldn't tell you if there was or not." (Id. at 25.) Officer Bartlett stated that White never reported any "trespassers" at the house and that, as far as he understood, those present at the home were allowed to be there. (Id.) Further, Officer Barlett testified that, when he asked Shaw's girlfriend, Stephanie Harris ("Harris"), where Shaw resided, she stated at the scene that he lived at the Hendricks residence. (Id. at 26.) In conclusion, Officer Bartlett stated that "[i]t is common practice for people of Mr. Shaw's age to frequent at different, several different locations." (Id. at 26.)

Dwayne Kelly ("Kelly"), who is White's brother and Shaw's uncle, testified that he did not know "exactly where" Shaw lived on October 28, 2008. (Id. at 27.) He testified that he believed Shaw did not live at the Hendricks residence. (Id. at 28.) Kelly stated that he knew that Shaw did not live there because it is his sister's house. (Id. at 29.) When asked to clarify how he knew Shaw did not live there, Kelly testified as follows: "I don't know exactly that he stayed there or not, but I know my sister stayed at the house and everything. I go by there and in the evening one night, he might be over there laying on the couch or something, something like that. I don't know if he stayed there or not." (Id.) Furthermore, Kelly stated, "I don't know [whether] he didn't stay there or not." (Id.) In conclusion, Kelly summarized that he would see Shaw at the residence "from time to time" but that he didn't "stay there." (Id.)

8

On cross-examination, Kelly agreed that you can "live somewhere but also stay other places." (Id. at 30.) When asked whether Shaw stayed at the Hendricks residence overnight on occasion, Kelly responded as follows: "Yes, sir, I seen him there before sleeping on the couch." (Id.) When asked if he simply did not know exactly whether Shaw actually lived at the Hendricks residence or just stayed there, Kelly responded, "Yes, sir." (Id.) Kelly testified that Shaw also stayed with his girlfriend and that he has seen Shaw "sleeping on the couch." (Id.) When asked if Shaw was on the couch in the morning, Kelly stated that he saw him sleeping on the couch "[a]ll the time, all time of days." (Id.) When specifically asked whether Shaw stayed overnight, Kelly responded as follows: "I don't know if it was 24 hours or not. I come over there and I seen him on the couch before" and that he was "sleeping." (Id.)    No further witnesses were presented at the evidentiary hearing, and no other documents were filed in support or opposition to the instant motion.

### III. Conclusions of Law

#### A. Standing

As a threshold issue, the United States asserts that Shaw lacks standing to move for the suppression of evidence. Specifically, the Government argues that Shaw does not have standing to contest the constitutionality of a search of his mother's residence and that this Court should discredit White's testimony regarding Shaw's ties to the home because she lacked credibility and had motive to assist her son. However, the United States concedes that, if the Court declines to discredit White's testimony, Defendant has established standing for the instant motion. (Id. at 4-5; Am. Resp. to Mot. to Suppress at 3 n.2.) Defendant responds that Shaw had sufficient ties to the residence to establish standing for the motion to suppress.

9

The United States Supreme Court has held that the defendant bears the burden of establishing standing to challenge a search or seizure. Rakas v. Illinois, 439 U.S. 128, 130 n.1 (1978); see also United States v. Sangineto-Miranda, 859 F.2d 1501, 1510 (6th Cir. 1988); United States v. Smith, 783 F.2d 648, 650 (6th Cir. 1986). The defendant may not vicariously assert the Fourth Amendment rights of another, Rakas, 439 at 133-14; instead, a defendant must demonstrate that a personal violation of his constitutional rights has occurred. Minnesota v. Carter, 525 U.S. 83, 88 (1998). To make such a showing, the defendant must satisfy the following two-part test: (1) whether he manifested a subjective expectation of privacy in the object of the challenged search; and (2) whether society is prepared to recognize that expectation as legitimate. California v. Ciraolo, 476 U.S. 207, 211 (1986); Sangineto-Miranda, 859 F.2d at 1510.

While the guarantees of the Fourth Amendment protect against unreasonable searches of "their persons [and] houses," the Supreme Court has held that, "in some circumstances a person may have a legitimate expectation of privacy in the house of someone else." Carter, 525 U.S. at 88-89 (1998). Thus, the Court has determined that an overnight guest in a house, including a child visiting the parents' residence under such circumstances, has a legitimate expectation of privacy that is protected by the Fourth Amendment. Minnesota v. Olson, 495 U.S. 91, 98-99 (1990); but see United States v. Jimmie Larry, No. 04-5119, 2005 WL 332425 (6th Cir. 2005) (holding that son did not have standing to challenge search of mother's apartment because he "was not permitted to be in her home when she was not present," "rarely made social visits to her home," "only came when she called him to do something," maintained his own separate residence where he "helps with the bills" and keeps all of his personal belongings, and was "never an overnight guest.").

The Olson Court stated that, "[t]o hold that an overnight guest has a legitimate expectation

10

of privacy in his host's home merely recognizes the every day expectations of privacy that we all share." Olson, 495 U.S. at 98-99.  The Olson court expounded upon its rationale for extending Fourth Amendment protections as follows:

> From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside. *We are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings. It is for this reason that, although we may spend all day in public places, when we cannot sleep in our own home we seek out another private place to sleep.*

Id. (emphasis added).

Yet, while the Fourth Amendment protects overnight guests, its guarantees do not extend to all persons legitimately on the premises.  Thus, a person who is "merely present with the consent of the householder" may not claim Fourth Amendment protections. Carter, 525 U.S. at 90.  In sum, the essential inquiry to determine whether Fourth Amendment guarantees apply is the "nature of the individual's ties to the property." United States v. Harris, 255 F.3d 288, 295 (citing Carter, 525 U.S. at 88-90).  Otherwise stated, Fourth Amendment protections require a "degree of acceptance into the household." Carter, 525 U.S. at 90.

As to Shaw's subjective expectation of privacy, the record contains only minimal information from which the Court can attempt to glean whether he believed to have any such expectation.  Even so, the record reflects that the Hendricks residence was Shaw's mother's residence and that Shaw manifested his subjective expectation of privacy by using the residence with her permission for personal reasons, such as washing clothes, visiting his family, and, most notably, sleeping at the residence during all hours of the day. (Feb. 19, 2010 H'rg Tr. at 25, 29.)

Additionally, Shaw manifested his subjective expectation of privacy by his statements to

11

Officer Bartlett admitting ownership of the items that were concealed at his mother's residence. (Id. at 70.)  Such attempts to conceal unlawful activity at a certain location have been held to demonstrate a person's subjective expectation of privacy. See Ciraolo, 476 U.S. at 211 (holding that defendant manifested his "subjective intent and desire to maintain privacy" by concealing his "unlawful agricultural pursuits" at the home); see also Rawlings v. Kentucky, 448 U.S. 98, 105 (1980) (concluding that a finding of subjective expectation of privacy is appropriate if the defendant "took normal precautions to maintain his privacy.").  Thus, the Court will proceed to the inquiry into whether Shaw had an expectation of privacy that society is prepared to recognize as legitimate. Ciraolo, 476 U.S. at 211; Sangineto-Miranda, 859 F.2d at 1510.

As to the legitimacy of Shaw's expectation of privacy in his mother's home, the Government asserts that the Court should discredit White's testimony in its entirety because it "should be considered not credible since it contradicted her contemporaneous statement that the defendant did not live at Hendricks, and she had an obvious motive to lie to protect her son." (Amend. Resp. in Opp. to Mot. to Suppress at 2.)  The Government further argues that "White's aggressive demeanor, disinclination to answer questions directly, obvious bias and her willingness to lie about whether she even made the statement to Bartlett that the defendant did not live at Hendricks demonstrate that White would have said anything to protect her son" and should be "disregarded." (Id. at 4-5.)  The United States concedes that, if this Court accredits White's testimony, Defendant has demonstrated that he had a legitimate expectation of privacy. (Id. at 3 n.2.)

Upon review of the record, the Court declines to discredit White's testimony. While the Government's position is well-taken, and while certain inconsistencies are present between her statements on the scene on October 28, 2008 and her testimony at the February 19, 2010 evidentiary

hearing, the Court does not find the inconsistencies to be irreconcilable. Specifically, on October 28, 2008, Officer Bartlett asked White if Shaw "live[d]" at her home and she responded that he did not. (Feb. 19, 2010 H'rg Tr. at 22.) When asked to state the individuals that "lived there," she responded that "her daughter and boyfriend are off and on sometimes as well at the residence." (Id.) She did not list Shaw as someone that "lived" at the residence, but she did state that he "does frequent by the house" and "was there off and on." (Id. at 22-23.)

Yet at the evidentiary hearing, even though White now characterized her son as "living" with her at the time the October 2008 incident occurred, the majority of her testimony simply expounded upon the nature and ties of his visits to her home. She explained that Shaw stayed at her home "[j]ust about every day" or that "you could say every day." (Id. at 7.) She explained that on some days Shaw would "go to his girlfriend's house and spend the night." (Id.) She stated that Shaw had permission to be at her home. (Id.) Even on cross-examination, she reiterated that she told Officer Bartlett that Shaw was at the residence "off and on" on October 28, 2008. (Id.) Officer Bartlett verified that White had described at the scene that Shaw "does frequent by the house" and was "there off and on." (Id. at 22-23.)

Thus, the Court finds that although White's testimony had certain contradictions, specifically in matters of semantics in her characterization of whether she considered that he "lived" there or not, the essence of her testimony both at the scene on October 28, 2008 and at the evidentiary hearing on February 19, 2010 was that her son did not permanently reside with her but instead visited the residence with frequency, that he had stayed there for a "couple of nights" prior to his arrest, but that he also stayed with his girlfriend on occasion. (Id. at 7.) The Court notes that Officer Bartlett verified that White's description of Shaw's ties to the home was essentially the same both on the

13

scene and at the evidentiary hearing. (Id. at 22-23.) White's testimony is consistent with the testimony of the Government's witness, Kelly, who also described Shaw's ties to the residence in similar terms (Id. at 28-29.) White's testimony is also substantiated by the Government's witness, Harris, who at the scene characterized Shaw as living at the Hendricks residence. (Id. at 26.) Accordingly, the Court declines to discredit White's testimony. (Id. at 7.) Because the Government thus concedes that Defendant has demonstrated a legitimate expectation of privacy,[5] the Court finds that Shaw has standing to bring the instant Motion to Suppress.

### B. Constitutionality of Search

Turning to the constitutionality of the search, Defendant asserts that the law enforcement officers had no lawful basis to enter the Hendricks residence. Specifically, Shaw argues that the arrest warrant for Brown was not sufficient to enter and that the officers failed to obtain a search warrant or establish reasonable belief that Brown was within the residence before entering. However, Shaw concedes that, if the Court finds that the entry was proper, neither the evidence obtained during the search of the residence nor the subsequent statements given by Shaw at the detention facility at 1080 Madison should be suppressed as "fruit of the poisonous tree" pursuant

---

[5] The Government's concession notwithstanding, the Court concludes that Shaw had a legitimate expectation of privacy in the Hendricks residence. Initially, both White and Kelly testified that Shaw slept at the Hendricks residence, which the Olson court has held to demonstrate a legitimate expectation of privacy. 495 U.S. at 98-99. Next, while the United States asserts that this case is analogous to Carter, the Court finds that the record does not reflect either that Shaw's ties to the Hendricks residence were of a "purely commercial nature" or especially that there was a "lack of any previous connection between" Shaw and the householder, his mother. 525 U.S. at 90. Finally, the Court is not persuaded by the Government's contention that Sangineto-Miranda is analogous to this case, as that court did not find it credible that the defendant intended to stay overnight at the residence, that the defendant had no familial relationship to the residence, that the defendant only was present to "transact some business," and that the record, "[a]t best," indicates that the defendant was a "casual visitor." 859 F.2d at 1510.

to Wong Sun v. United States, 371 U.S. 471, 488 (1963).  (Feb. 19, 2010 H'rg Tr. at 77-79.)

"For Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is inside." Payton v. New York, 445 U.S. 573, 603 (1980).  However, officers may not enter the home of a third party based only on a valid arrest warrant; instead, if the officers believe that the subject of an arrest warrant is located within the home of a third party, they are required to obtain a search warrant prior to entry.  Steagald v. United States, 451 U.S. 204, 213-14 (1981).

Despite the requirement announced in Steagald that officers obtain a search warrant prior to entering the home of a third-party, "an arrest warrant is sufficient to enter a residence if the officers, by looking at the totality of the circumstances establish a reasonable belief that the subject of the arrest warrant is within the residence at the time." United States v. Pruitt, 458 F.3d 477, 483 (6th Cir. 2006); see also El Bey v. Roop, 530 F.3d 407, 415 (6th Cir. 2008); United States v. Bervaldi, 226 F.3d 1256, 1267 n.11 (11th Cir. 2000).

In the instant case, Officers Cheirs and Robinson followed their directions to 3171 Hendricks but found no such address marked.  Instead of investigating the address at the exterior of the residence, they "decided to go to the house with the open door" that had "lots of cars in front." (Feb. 19, 2010 H'rg Tr. at 34.)  Officer Cheirs explained that he attempts to "make contact" first before attempting other efforts at verifying the address. (Id. at 49.)  While Shaw asserts that the officers should have investigated the address on the exterior of the residence instead of attempting to investigate by making contact with the occupants, the Court finds that there is nothing unreasonable about the officers' method of investigation, as they were attempting to locate an individual and

15

proceeded to the home where people appeared to be congregated.

Upon approaching the residence, Officer Cheirs was met with a "blacked out" door and had a female close the door on him despite the fact that he was wearing a police uniform. (Id. at 35, 50-51.) Officer Cheirs began knocking on the door, and it took nearly seven to eight minutes for the female to open the door. In light of what Officer Cheirs believed to be suspicious circumstances, he opined that he thought they "had the right address more so." (Id. at 57.) Further, Officer Cheirs stated that, after the female closed the door on him, he thought she was the subject of the arrest warrant and that they had "one fixing to run or something, fixing to hide." (Id. at 56-57.) Given the female's behavior and the officer's concern that the possible subject may attempt to flee, the Court finds that it was reasonable for the officers to continue their investigation at the residence that they believed to be 3171 Hendricks.

While waiting on the female to open the door and when she ultimately opened the door, Officer Cheirs announced to the female occupant that they had "a warrant for this address." (Id. at 36, 38.) Officer Cheirs did so at this point without making any further inquiry into the street number of this residence, but he stated that he "probably" stated this because he believed he had the correct address based upon the suspicious activity and because "they acted the way she acted." (Id. at 57.) Although it appears to the Court that Officer Cheirs's announcement was premature,[6] Officer Cheirs immediately proceeded to inquire into "who all lives here" and "who's the owner?" (Id. at 35-36.) The occupants did not "really say who was the owner" but asked who the officers were looking for and what address they sought (Id. at 36.) Officer Cheirs stated that they were looking for 3170

---

[6] Based upon this announcement that the officers "made a show that they had a warrant before they entered the home," the Government elected to abandon its position that the officers lawfully searched the home based upon consent. (Feb. 19, 2010 H'rg Tr. at 77.)

Hendricks instead of the actual address on the warrant of 3171 Hendricks. (Id. at 36.) Officer Cheirs stated that he intentionally asked about the incorrect address because people often lie about the address. (Id. at 37-38.) Thus, he stated that he used this technique to illicit "what was really the address here." (Id. at 38.) In response, a female responded that the address was 3171, and "then everybody else said 3171" and "confirmed it." (Id. at 36, 38, 59.)

Therefore, because multiple occupants of the residence volunteered the address of 3171 to Officers Cheirs and Robinson, because this was the address listed on the arrest warrant for Brown, and because they did so before they began any search of the residence for Brown, the Court finds that the officers had a reasonable belief that the subject of the arrest warrant was within the residence. In fact, the officers additionally had reasonable belief that this residence was not even a third-party residence, but instead that it was Brown's own residence. The reasonableness of their belief is further substantiated by Officer Cheirs' testimony that the sole purpose of his investigation and inquiry was to find out "what was really the address here." (Id. at 38.)

Accordingly, the Court finds that Officers Cheirs and Robinson acted lawfully in searching the residence for Brown in accordance with the arrest warrant and their reasonable belief that the subject was within the residence. As the Court finds that Officers Cheirs and Robinson entered the home lawfully, Shaw has conceded that neither the evidence obtained during the search of the residence nor the subsequent statements given by Shaw at the detention facility at 1080 Madison should be suppressed as "fruit of the poisonous tree" pursuant to Wong Sun v. United States, 371 U.S. 471, 488 (1963). (Id. at 77-79.) Thus, the Court finds no basis for suppression of evidence in this matter.

## IV.  Conclusion

For the reasons set forth herein, the Court RECOMMENDS that Defendant's Motion to Suppress be DENIED.

**IT IS SO ORDERED** this 19th day of August, 2010.

s/ Charmiane G. Claxton
CHARMIANE G. CLAXTON
UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C).  FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**